UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**MEMORANDUM & ORDER**

ART OF HEALING MEDICINE, P.C.,

        Plaintiff,

14-CV-4001

– against –

SYLVIA MATHEWS BURWELL, *in her
official capacity as Secretary of Health
and Human Services,*

        Defendant.



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 1 1 2015 ★

BROOKLYN OFFICE

**Parties**

Art of Healing Medicine, P.C.

Sylvia Mathews Burwell,
*in her capacity as Secretary of Health
and Human Services*

**Appearances**

Martin Bienstock
Weisbrod Matteis & Copley PLLC
1200 New Hampshire Avenue NW
Suite 600
Washington, DC 20036
(202) 499-7900
mbienstock@wmclaw.com

Layaliza K. Soloveichik
Margaret M. Kolbe
United States Attorney's Office
Eastern District Of New York, Civil Division
271 Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
(718) 254-6298
layaliza.soloveichik@usdoj.gov
margaret.kolbe2@usdoj.gov



JACK B. WEINSTEIN, Senior United States District Judge

**Table of Contents**

I.   Introduction ...............................................................................................................3
II.  Facts .........................................................................................................................4
  A.  Medicare Payment Process Regarding Supplemental Health Insurance Benefits............4
    1.  Requirements for Documenting Psychiatric Services ..................................4
    2.  MACs and Initial Medicare Payment Determinations ................................5
    3.  RACs and the Medicare Integrity Program .............................................7
  B.  Challenging an Audit Finding:  Five-Stage Appeals Process..........................................8
    1.  MAC Redetermination Request..................................................................8
    2.  QIC Reconsideration .................................................................................9
      a.  Procedural Dismissal..........................................................................9
      b.  Substantive Redetermination ............................................................9
    3.  Administrative Law Judge Hearing ..........................................................10
    4.  Appeals Council Review ...........................................................................10
    5.  Judicial Review..........................................................................................11
  C.  Denial of Plaintiff's Medicare Reimbursement Claims...................................................11
    1.  Dr. Pinkusovich's Psychiatric Practice ...................................................11
    2.  SafeGuard Services Audits Dr. Pinkusovich's Billing Records..................12
    3.  Art of Healing Appeals the Audit Findings..............................................13
      a.  MAC Dismisses Art of Healing's Appeal for Failure to Identify Beneficiaries
          Whose Claims Had Been Denied .....................................................13
      b.  Plaintiff Resubmits Redetermination Request to MAC ...................15
      c.  Plaintiff Initiates Concurrent Action with QIC to Appeal MAC Dismissal .....15
      d.  MAC Issues Merits Decision Adverse to Plaintiff............................15
      e.  QIC Vacates Dismissal But Still Issues Unfavorable Merits Determination....16
      f.  Plaintiff Unsuccessfully Appeals MAC's Merits Redetermination to QIC......17
      g.  Plaintiff Exercises Its Right to Present Its Case to Appeals Council, Which
          Upholds Overpayment Determination ............................................19
  D.  Timeline of Events...........................................................................................................21
III. Law ...........................................................................................................................24
  A.  Administrative and Judicial Review Under the Medicare Act .........................................24
    1.  Relevant Statutory Authority....................................................................24
    2.  Section 405(g) Sixth Sentence Remands..................................................26
  B.  The *Accardi* Doctrine ...................................................................................................27
  C.  The Administrative Procedure Act .................................................................................28
IV.  Application of Facts to Law ........................................................................................29
V.   Conclusion .................................................................................................................31

## I. Introduction

Plaintiff Art of Healing, P.C. ("Art of Healing") brings this action pursuant to the Medicare Act, 42 U.S.C. §§ 405(g)–(h) and § 1395ff(b)(1)(A), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. At issue are its claims for reimbursement by Medicare for psychotherapy services provided to Medicare beneficiaries by Art of Healing.

The Secretary of Health and Human Services ("Secretary"), pursuant to the sixth sentence of section 405(g) of Title 42 of the United States Code, requests a remand to the Commissioner of Social Security. She concedes that the Medicare Appeals Council of the Departmental Appeals Board ("Appeals Council") failed to address plaintiff's argument that the Qualified Independent Contractor ("QIC") panel physician, who conducted a review of the overpayment determination regarding plaintiff's services, was not qualified to do so.

Opposing remand, Art of Healing cross-moves for summary judgment. Setting aside the fact that the QIC panel physician may not have been appropriate, plaintiff additionally argues that the Appeals Council failed to recognize that the QIC decision was erroneous on its face. Alleged is that the QIC was prohibited from issuing a merits based decision when the appeal before it was on procedural grounds only. Plaintiff recognizes that its summary judgment claims under the Medicare Act, the *Accardi* doctrine, and the APA are "*inextricably intertwined*" with the failure of the Appeals Council to address the qualifications of the QIC physician. (Pl.'s Mem. of Law in Further Supp. of Mot. for Summ. J. 2, ECF No. 24 (emphasis added).) Yet, it argues that reversal of the Appeals Council decision on procedural grounds is required so that no purpose would be served by remand.

Were the court to find—in line with the Secretary's concession—that the Appeals Council decision is deficient, the proper procedure would be to remand to the agency for further

proceedings under the sixth sentence of 405(g) of Title 42 of the United States Code. At this juncture in the dispute, remanding the instant action, which plaintiff admits deals with facts "inextricably intertwined" with its motion for summary judgment, is probably the most efficient course in deciding the case as it is now shaped. *See, e.g.*, Fed. R. Civ. Pro. 1 ("secure the just, speedy, and inexpensive determination of every action"). The Appeals Council, which is expert in this field, can be expected to arrange for the case to be decided expeditiously on the merits.

Defendant's motion to remand is granted. Plaintiff's motion for summary judgment is denied.

## II. Facts

### A. Medicare Payment Process Regarding Supplemental Health Insurance Benefits

The Medicare program was enacted in 1965 to provide health insurance to individuals sixty-five years of age and older. 42 U.S.C. § 1395 *et seq*. One of the program's objectives is to ensure that its beneficiaries have access to healthcare from providers, including doctors and institutions offering psychiatric services. *Id.* The type of benefits at issue here are supplemental health insurance benefits that cover certain services for beneficiaries who voluntarily enroll and pay additional premiums. 42 U.S.C. § 1395j *et seq*. These benefits are referred to as "Part B benefits." 42 C.F.R. § 1000.20.

#### 1. Requirements for Documenting Psychiatric Services

Plaintiff emphasizes that the requirements for documenting psychiatric services are outlined in Local Coverage Determination No. L26895 ("LCD"). (*See* Administrative Record ("Admin. Rec.") 392–420 (LCD Manual), ECF No. 14.) Under the LCD, documenting the medical necessity of psychiatric services differs from documenting the medical necessity of other services in significant ways:

*First*, under the Privacy Rule of the Health Insurance Portability and Accountability Act

4

of 1996 ("HIPAA"), psychotherapy notes are confidential and may not be submitted as part of a claim for services. (*Id.* at 411.) Instead, the physician is required to extract the information necessary for billing review without disclosing confidential information. (*Id.* at 412.)

*Second*, successful treatment of psychiatric patients with long-term chronic conditions does not require demonstrable improvement; success can include the avoidance of hospitalization. (*Id.* at 395 ("It is not necessary that a course of therapy have as its goal restoration of the patient to the level of functioning exhibited prior to the onset of illness. . . . Where there is reasonable expectation that if treatment services were withdrawn the patient's condition would deteriorate, relapse further, or require hospitalization, this criterion would be met.").)

*Third*, information concerning treatment plans, functional status, and prognostic assessment need not be documented on individual dates of service, but can be identified from the record in the aggregate. (*Id.* at 412 ("Elements such as treatment plans, functional status and prognostic assessment are expected to be documented, updated and available for review, but do not need to be delineated for each individual date of service.").)

*Fourth*, the duration of services may be indeterminate, and the appropriate frequency of services can be determined based upon "accepted norms of medical practice." (*Id.* at 73, Letter from QIC to Art of Healing, dated April 12, 2013 (detailing references to LCD).)

## 2. MACs and Initial Medicare Payment Determinations

When medical providers furnish Part B services to Medicare beneficiaries, the providers, including psychiatrists and the institutions for which they work, typically submit claims for reimbursement to Medicare Administrative Contractors ("MACs"). 42 U.S.C. § 1395ff(a)(2)(A). The Secretary enters into contracts with MACs pursuant to section 1395kk-1 of the Medicare Act. 42 U.S.C. § 1395u(a). These government contractors make coverage determinations in

accordance with the Medicare Act and its corresponding regulations, authorizing payments for items and services provided to Medicare beneficiaries. 42 U.S.C. §1395kk-1(a)(3)–(4); 42 C.F.R. §§ 421.200, 421.400 *et seq.*

Upon receipt of a Part B claim for payment, a MAC will issue a notice of "initial determination." 42 U.S.C. § 1395ff(a)(1); 42 C.F.R. §§ 405.920, 405.921. This "initial determination" notice indicates whether there is coverage and, if so, the amount payable. 42 C.F.R. §§ 405.920. An initial determination includes the following assessments: (1) whether the items and services furnished are covered under Medicare; (2) whether there has been an overpayment; and (3) whether the waiver of adjustment or recovery of an overpayment is appropriate. 42 C.F.R. §§ 405.924(b)(1) & (12). These determinations are not final.

As a general rule, MACs authorize payments on Part B claims "immediately" upon receipt of a claim in order to facilitate claims processing and cash flow to Medicare providers; only later are these determinations audited. *Gulfcoast Med. Supply, Inc. v. Sec'y of Health and Human Serv.'s*, 468 F.3d 1347, 1349 (11th Cir. 2006) ("For reasons of administrative efficiency, carriers typically authorize payments on claims immediately upon receipt of the claims, so long as the claims do not contain glaring irregularities. Later, carriers conduct post-payment audits to verify that the payments were proper."); *Maximum Comfort, Inc. v. Sec'y of Health and Human Servs.*, 512 F.3d 1081, 1084 (9th Cir. 2007) *cert. denied* 555 U.S. 822 (2008) (same); *Anghel v. Sebelius*, 912 F. Supp. 2d 4, 8 (E.D.N.Y. 2012) ("[D]ue to the large number of Medicare claims submitted annually to [c]arriers, it is virtually impossible to examine each bill in sufficient detail to assure before payment in every case that only medically necessary services have been provided. Therefore . . . [c]arriers . . . conduct post-payment audits of providers' records to ensure that proper payments were made." (internal quotation marks and citations omitted).).

### 3. RACs and the Medicare Integrity Program

Under the Medicare Integrity Program, Recovery Audit Contractors ("RACs") conduct post-payment audits to verify that the initial Part B payments made by MACs were proper. 42 U.S.C. § 1395ddd(b); 42 C.F.R. § 421.304. The post-payment audit process typically proceeds as follows:

> In conducting a post-payment audit, . . . a probe sample of billings from a physician [is requested], in order to determine whether there is a likelihood of overpayment by Medicare. . . .
>
> Following a probe sample, . . . a statistically valid random sample ("SVRS") from the physician [is requested]. The SVRS is then extrapolated to the physician's total billing, in order to provide a reasonable approximation of the total overpayment when the quantity of billing is overly abundant. If, following an audit, [it is] determine[d] that an overpayment has been made, . . . Medicare payments from the provider [may be offset or recouped].

*Anghel*, 912 F. Supp. 2d at 9.

In some situations, the Act limits the liability of a provider when the individual did not know, or could not be expected to know, that the services would not be approved for payment under Medicare. 42 U.S.C. § 1395pp(a). A provider is expected to know which services are excluded from coverage based on Centers for Medicare and Medicare Services ("CMS") notices, including manual issuances, and bulletins, or other written guides or directives from MACs. 42 C.F.R. § 411.406(e)(1); *see also, e.g.*, Medicare Claims Processing Manual Ch. 30, §§ 20, 30.2, 40.1, *available at* www.cms.gov.

Medicare cannot recover Part B overpayments made to a provider if the provider was "without fault" with respect to the overpayment. 42 C.F.R. § 1395pp(2). "[A] provider of services is without fault where she exercises reasonable care in the billing for, and acceptance of, payments made to her by the Medicare Program." *Anghel*, 912 F. Supp. 2d at 25 (finding that Medicare statute, CMS regulations, and manual provisions belied plaintiff's contention that she

took care to ensure that her billings were in full compliance with Medicare's requirements). *See also Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 64 (1984) (providers have a duty to familiarize themselves with legal requirements for cost reimbursement).

After a RAC has determined that a Part B claim should be disallowed, or that a provider was overpaid, the determination may be challenged. 42 C.F.R. § 405.940.

### B. Challenging an Audit Finding: Five-Stage Appeals Process

There are five levels in the Medicare Part B appeals process.



Department of Health and Human Services–Centers for Medicare and Medicaid, "Medicare Appeals Process," 1 (2014) (adapted), *available at* www.cms.gov. This multi-level administrative appeals process must be exhausted before a claimant can seek judicial review. *Heckler v. Ringer*, 466 U.S. 602, 627 (1984).

### 1. MAC Redetermination Request

A provider challenging an overpayment determination may first seek a "redetermination" from the MAC that initially processed its claim. 42 U.S.C. §§ 1395ff(b)(1)(A), (c)(1); 42 C.F.R.

§§ 405.940. A redetermination involves an independent review of the claim by a MAC employee who was not involved in making the initial determination. 42 C.F.R. § 405.948.

Redetermination requests may be dismissed on various procedural grounds, including lack of a valid request, failure to file within the proper filing time, and lack of an initial determination on the claim. *Id.* at § 405.952(b). If the redetermination request is not dismissed, a merits decision is issued by the MAC. *Id.* at § 405.954. This substantive determination is a condition precedent to any further appeal or review of the disallowance at issue. *Id.* at § 405.960.

### 2. QIC Reconsideration

Appeals of procedural dismissals and substantive redeterminations issued by a MAC are referred to as QIC "reconsiderations." *Id.* at § 405.974.

#### a. Procedural Dismissal

While MAC procedural dismissals may be appealed to the QIC, substantive materials related to the merits of the claim are not submitted to the QIC panel. (Admin. Rec. 701, Letter from NGS to Art of Healing, dated December 28, 2012 (dismissal of redetermination request).) A procedural review is strictly limited to the appropriateness of the dismissal on procedural grounds. (*Id.*)

#### b. Substantive Redetermination

A substantive appeal of a MAC redetermination involves assessing the disallowance at issue. 42 U.S.C. § 1395ff(c)(3)(B)(i). The Medicare Act requires a healthcare professional similarly situated to the one whose billing records are being called into question to review the appeal. *Id.* at § 1395ff(g). The statute indicates that the QIC review panel must include (1) a physician who (a) is appropriately credentialed or licensed in one or more states to deliver healthcare services and (b) has medical expertise in the field of practice that is appropriate for the

items or services at issue, or (2) a healthcare professional legally authorized to provide such services. *Id.* at §§ 1395ff(c)(3)(B)(i), (g)(1)(c), (g)(4)(a)–(b).

### 3. Administrative Law Judge Hearing

A party dissatisfied with a QIC reconsideration decision may request a hearing by an administrative law judge ("ALJ") as long as the amount in controversy is at least $100. *Id.* at §§ 1395ff(b)(1)(E)(i), (d)(1); 42 C.F.R. §§ 405.1000, 405.1002(a), 405.1006(b). If, within ninety days, the party does not receive a decision from the ALJ, it may escalate its challenge to the Appeals Council, skipping the ALJ review process. 42 U.S.C. § 1395ff(d)(3)(A).

### 4. Appeals Council Review

Parties are not entitled to a hearing before the Appeals Council. 42 C.F.R. § 405.1108(a). In the event an ALJ decision has issued, the Appeals Council, which renders the final decision of the Secretary, may adopt, modify, or reverse the ALJ's decision. *Id.* The Appeals Council may take any of the following actions:

> (1) Issue a decision based on the record constructed at the QIC and any additional evidence, including oral testimony, entered in the record by the ALJ before the case was escalated;
>
> (2) Conduct additional proceedings, including [] hearing[s], that the [Appeals Council] determines are necessary to issue a decision;
>
> (3) Remand the case to an ALJ for further proceedings, including a hearing;
>
> (4) Dismiss the request for MAC review because the appellant does not have the right to escalate the appeal; and
>
> (5) Dismiss the request for a hearing for any reason that the ALJ could have dismissed the request.

*Id.* at § 405.1108(d).

### 5. Judicial Review

So long as the amount remaining in controversy is at least $1,000, a dissatisfied provider can seek review by a federal court. 42 U.S.C. §§ 1395ff(b)(1)(A) (incorporating by reference the limited waiver of sovereign immunity in 42 U.S.C. §§ 405(g), (b)(1)(E)(i); 42 C.F.R. §§ 405.1130, 405.1136(a)(1), 405.1006(c)(1).

The steps involved at each level of the appeals process can be summarized as follows:

| Level | What happens? | When must you request an appeal? | When should you get a decision? |
|-------|---------------|----------------------------------|----------------------------------|
| MAC Redetermination | Document review of initial claim determination | Up to 120 days after initial determination received from MAC | 60 days |
| QIC Reconsideration | Document review of MAC redetermination; any evidence not previously presented may be submitted at this level | Up to 180 days after MAC redetermination notice is received | 90 days |
| ALJ Hearing | On-the-record review or interactive hearing between parties | Up to 60 days after QIC reconsideration received | May be delayed due to volume |
| Medicare Appeals Council Review | Document review of ALJ's decision or dismissal; hearing not mandatory | Up to 60 days after ALJ decision received, or after expiration of applicable ALJ hearing timeframe if no decision received | 90 days if appealing ALJ decision, or 180 days if ALJ review time expired without decision |
| Judicial Review by U.S. District Court | Hearing on motions and issuance of final judgment | Up to 60 days after Appeals Council decision received, or after expiration of applicable Appeals Council review timeframe if no decision received | No statutory time limit |

Medicare Appeals Process at 9 (adapted).

## C. Denial of Plaintiff's Medicare Reimbursement Claims

### 1. Dr. Pinkusovich's Psychiatric Practice

Dr. Alexander Pinkusovich completed his residency training in psychiatry at the Albert

Einstein College of Medicine in the Bronx, New York in 1996. (Admin. Rec. 346, Curriculum Vitae of Dr. Alexander Pinkusovich.) Before coming to the United States, he worked at a psychiatric hospital in Ukraine, treating patients with acute psychiatric disorders. (*Id.*) He has been in psychiatric practice for over forty years, receiving recognition for his work from institutions like the Ukrainian Psychiatric Society and the Ukrainian Department of Health. (*Id.*)

As the Administrative Director of plaintiff, Dr. Pinkusovich served the Russian immigrant population in Brooklyn, New York. (*Id.* at 352, Sworn Affidavit of Dr. Philip Muskin, dated April 12, 2013.) He primarily treated an elderly and disabled Russian-speaking population suffering from severe psychiatric and psychological problems. (*Id.*) Dr. Pinkusovich treated these patients with a combination of medication and psychotherapy intended to prevent their further deterioration, relapse, or hospitalization. (*Id.* at 350–51.) His psychotherapy sessions, including their frequency, varied by patient. (*Id.* at 351) He supervised substantial expenditures for psychotropic and other drugs that he prescribed for his patients. (*Id.* at 1023–2102, Assorted Medical Records of Dr. Pinkusovich's Patients.)

### 2. SafeGuard Services Audits Dr. Pinkusovich's Billing Records

In October of 2012, after completing a review that began in June 2011, SafeGuard Services LLC ("SafeGuard"), a RAC authorized to review claims in a region that includes New York State, found that Dr. Pinkusovich had used a "template tool" that employed standard wording to bill Medicare. (*Id.* at 636, Letter from SafeGuard to Art of Healing, dated October 9, 2012 (notice of initial overpayment determination).)

The SafeGuard consultant auditing the Art of Healing record reviewed ninety-one clinical notes from forty-one patients that involved billings amounting to $34,386.91. (*Id.* at 4 (Appeals Council Decision, dated April 24, 2014).) An extrapolation methodology from this analysis was applied to services rendered by Dr. Pinkusovich from January 3, 2008 through April 3, 2011.

12

(*Id.* at 633, Letter from SafeGuard to Art of Healing, dated October 9, 2012 (initial overpayment determination).) SafeGuard calculated an overpayment amount of $410,468.95 made by Medicare to Art of Healing. (*Id.* at 633, 638.)

The SafeGuard consultant identified "a trend within the documentation as repetitive, contradictory, and limited." (*Id.* at 637.) Discrepancies were identified between the billing and the services recorded for one patient in Dr. Pinkusovich's records. (*Id.*) The consultant was unable to assess whether the patient's medical condition was improving, highlighting references made by Dr. Pinkusovich to the patient's "dress or personal hygiene," rather than to medical conditions that supported a medical necessity for the continuation of individual psychotherapy. (*Id.*)

On October 9, 2012, SafeGuard apprised plaintiff of its findings. (*Id.* at 633.) The notice provided specific reasons for the denial of claims made on behalf of at least five beneficiaries, and listed the Medicare health insurance claim numbers and the psychiatric treatment dates of other claims denied. (*Id.* at 637).

Two weeks later, on October 23, National Government Services ("NGS"), the MAC that had made the initial payment determinations on the claims audited by SafeGuard, sent a letter to plaintiff indicating that the Department of Health and Human Services sought to recoup $410,468.95. (*Id.* at 613.)

### 3. Art of Healing Appeals the Audit Findings

#### a. MAC Dismisses Art of Healing's Appeal for Failure to Identify Beneficiaries Whose Claims Had Been Denied

On November 21, 2012, Art of Healing sought a redetermination of the October 23 overpayment assessment from NGS. (*Id.* at 600, Letter from Art of Healing to NGS, dated November 21, 2012.) In its letter, plaintiff maintained that the overpayment determination was

based on a mistake. (*Id.*) It noted that "the documentation review[] [performed by SafeGuard] did not include patients' Initial Psychiatric Evaluations, or Psychiatric Treatment Plans." (*Id.*) Art of Healing wrote: "[I]t is therefore highly disappointing that the reviewer did not, as it had promised, contact the provider to ask for the additional documents, as it had claimed in its audit letter that it would." (*Id.*) Art of Healing cited procedural errors on the part of the RAC consultant, such as SafeGuard's failure to provide notice of the reopening of the claims and its failure to specify on what grounds the determination to reopen was made. (*Id.* at 608.) Plaintiff concluded by requesting that NGS provide it with "the identity and credentials of its [RAC] consultant" and "any materials that he or she relied on in performing the analysis." (*Id.* at 610.)

One month later, on December 28, 2012, plaintiff's redetermination request was dismissed. (*Id.* at 698, Letter from NGS to Art of Healing, December 28, 2012.) The letter from NGS to plaintiff noted that the redetermination request was being denied "because it did not contain all of the information" necessary to process the request—*i.e.*, Art of Healing had omitted to include: (1) the beneficiaries' name; (2) the Medicare health insurance claim number of the beneficiaries; (3) the specific service(s) and/or item(s) for which the redetermination is being requested and the specific date(s) of service; and (4) the name and signature of the person filing the request. (*Id.*) Plaintiff received a second letter from NGS stating that an Appointment of Representative form was required to process Medicare claims on appeal. (*Id.* at 687, Letter from NGS to Art of Healing, dated December 28, 2012.)

While the dismissal of Art of Healing's redetermination request detailed plaintiff's right to appeal the decision, because the dismissal was made on procedural grounds, plaintiff was counseled not to submit substantive materials to the QIC panel. (*Id.* at 699, Letter from NGS to Art of Healing, dated December 28, 2012.) The dismissal letter clarified: "QIC will not

consider any evidence for establishing coverage of each claim being appealed. Their examination will be limited to whether or not the dismissal was appropriate." (*Id.*)

### b. Plaintiff Resubmits Redetermination Request to MAC

On January 7, 2013, plaintiff resubmitted its November 21, 2012 redetermination request to NGS. (*Id.* at 711, Letter from Art of Healing to NGS, dated January 7, 2013.) Aside from the inclusion of the Appointment of Representative form, the papers submitted were identical to the November 21 request. (*Id.*)

### c. Plaintiff Initiates Concurrent Action with QIC to Appeal MAC Dismissal

On January 15, 2013, plaintiff appealed the December 28, 2012 NGS dismissal to the QIC. (*Id.* at 45–48, Letter from Art of Healing to QIC, dated January 15, 2013.) This procedural appeal was dismissed fifteen days later by the QIC because, as NGS had found, plaintiff had failed to identify the beneficiaries whose claims had been denied. (*Id.* at 50, Letter from QIC to Art of Healing, dated January 30, 2013.)

Less than one week later, on February 5, plaintiff resubmitted its January 15 appeal to the QIC; this time, it included a disc received from SafeGuard containing information about the beneficiaries whose claims had been denied. (*Id.* at 55, Letter from Art of Healing to QIC, dated February 5, 2013.)

At this point, plaintiff had two concurrent actions pending regarding the same claims: one before NGS and one before the QIC.

### d. MAC Issues Merits Decision Adverse to Plaintiff

On February 20, 2013, issuing a redetermination on the merits, NGS found that plaintiff had been overpaid by Medicare. (*Id.* at 57, Letter from NGS to Art of Healing, dated February 20, 2013.) The eight-page ruling from the MAC stated: "We have determined that the refund

requested for the services on the enclosed spreadsheet was correct. We have also determined that Art of Healing . . . is responsible for the overpayment. . . . The information submitted with this request was carefully reviewed and considered." (*Id.* at 59.)

### e. QIC Vacates Dismissal But Still Issues Unfavorable Merits Determination

Five days later, the QIC vacated its January 30 dismissal, reinstating Art of Healing's January 15 appeal. (*Id.* at 531, Letter from QIC to Art of Healing, dated February 25, 2013.) The letter from the QIC to plaintiff indicated that a decision would be made on the papers, without a hearing, and without the need for further follow-up. (*Id.*)

On April 12, 2013, QIC issued a reconsideration on the merits. (*Id.* at 66–75, Letter from QIC to Art of Healing, dated April 12, 2013 (detailing procedures and analysis employed by the QIC to reconsider plaintiffs' claim, including the "statistically valid random sample" and references to the LCD).) This decision, signed by Frank DelliCarpini, M.D., was unfavorable to plaintiff. (*Id.* at 66.) The decision noted:

> One of the findings in this review was the use of template-type documentation to record therapy notes. The verbiage was standard throughout all of the submitted therapy notes for every beneficiary. It was noted that several sections were reprinted almost word for word from one therapy note to the next.
> . . .
> There were several repetitive inconsistent statements common to almost all of the submitted therapy notes[.]
> . . .
> Another area of inconsistencies was noted with the documentation of particular statements.
> . . .
> The repetitive, almost template documentation would not support the medical necessity for any services or that the continuation of services would be reasonable. It is possible for patient privacy to be maintained and medical necessity still be supported. Notes that are markedly similar from visit to visit, or are interchangeable

from patient to patient, do not provide support for the medical necessity of services.

(*Id.* at 73–74.)

In its summary judgment motion, plaintiff takes issue with the review conducted at the QIC level. (Pl.'s Mot. for Summ. J. 24, ECF No. 17.) Art of Healing points to documents suggesting that review of Dr. Pinkusovich's billing records at the QIC level was conducted by a licensed registered nurse, not Dr. DelliCarpini, a specialist in internal medicine, not psychiatry, who simply affixed his name to the report. (Admin. Rec. at 547, Letter from QIC to Art of Healing, dated April 12, 2013 ("Medical Decision Maker's Credentials").)

### f. Plaintiff Unsuccessfully Appeals MAC's Merits Redetermination to QIC

On April 16, 2013, plaintiff appealed NGS's February 20 redetermination to the QIC panel. (*Id.* at 121–37 (Letter from Art of Healing to QIC, dated April 16, 2013.) In this appeal, plaintiff included the sworn affidavit of Dr. Philip Muskin, Professor of Clinical Psychiatry and Chief of Consultation-Liaison Psychiatry at Columbia University Medical Center. (*Id.* at 349–52, Curriculum Vitae of Dr. Philip Muskin, prepared April 11, 2013.) Dr. Muskin had reviewed Dr. Pinkusovich's billing records and determined that the services provided were "medically necessary" and supported by the documentation originally submitted to NGS. (*Id.* at 351.)

Plaintiff received notice of the QIC's unfavorable reconsideration on April 19, 2013, three days after it had sent its appeal of NGS's February 20, 2013 redetermination to the QIC. (*Id.* at 524, Letter from Art of Healing to QIC, dated April 22, 2013 (requesting retraction of April 12, 2013 QIC decision).) In response, plaintiff sent a letter to the QIC asking it to retract its April 12, 2013 decision. (*Id.* at 524–26.) Plaintiff argued that the QIC improperly reviewed NGS's February 20, 2013 redetermination, stating:

The [April 12, 2013] letter was issued in error; it mistakenly reviewed a redetermination issued prior to the date on which the provider actually appealed the redetermination, *i.e.*, without [the] provider's or its representative['s] formal request and without the information necessary for a proper review. The April [12], 2013, letter was therefore without any reasonable basis, in law or in fact.

. . .

The actual appeal of the redetermination was submitted to [the QIC] by USPS overnight mail on April 16, 2013. . . . The April [12], 2013 letter was therefore premature; when [the QIC] issued the letter, it did not have before it either the February 20, 2013 NGS redetermination decision it claimed it was reviewing, or the comprehensive appeal letter, affidavit, and other materials that the provider submitted on April 16, 2013, in response to the redetermination.

. . . That information has now been submitted to [the QIC] and is currently pending before it, and we respectfully request that you treat the April 16, 2013, submission as the appropriate QIC appeal from the redetermination, with an accompanying stay of recoupment.

[The QIC] error was apparently—as best we can tell—caused by an appeal of an earlier *dismissal* of Art of Healing's request for a redetermination. An appeal of a dismissal is very different from an appeal of a redetermination, and something specifically permitted by the rules governing QICs.

(*Id.* at 524–25 (emphasis in original).)

On April 26, 2013, Dr. Pinkusovich himself wrote a letter to the QIC, emphasizing: "Frankly speaking I have [a] feeling that [the] QIC is simply being used as a cover up for extortion [being] conducted by SafeGuard." (*Id.* at 159.)

Dubbing Art of Healing's appeal of NGS's February 20 redetermination a "duplicate submission," on May 21, 2013, the QIC dismissed the appeal. (*Id.* at 164, Letter from QIC to Art of Healing, dated May 21, 2013 (dismissing April 16 appeal).) Plaintiff was informed to address any further appeal to the ALJ. (*Id.* at 165.)

### g. Plaintiff Exercises Its Right to Present Its Case to Appeals Council, Which Upholds Overpayment Determination

The next month, on June 10, plaintiff appealed the QIC's April 12, 2013 reconsideration to the Office of Medicare Hearings and Appeals ("OMHA"). (*Id.* at 313, Letter from Art of Healing to OMHA, dated June 10, 2013.) Not having received an ALJ decision, on November 18, 2013, plaintiff exercised its right to have its case reviewed by the Appeals Council. (*Id.* at 149, Letter from Art of Healing to Appeals Council, dated November 18, 2013.) Dr. Pinkusovich sent a personal letter to the Appeals Council on November 25, 2013, reiterating his earlier allegations that the QIC was engaged in "wrongdoing." (*Id.*)

In an order dated January 23, 2014, the Appeals Council stated that it would decide the case without a hearing. (*Id.* at 144–47, Letter from Appeals Council to Art of Healing, dated January 23, 2014.)

On April 24, 2014, the Appeals Council adopted the QIC's determination, but modified its rationale to address more fully the factual and legal bases for upholding the denial. (*Id.* at 4, Appeals Council Decision, dated April 24, 2014.) Finding that the QIC acted properly in deciding to *sua sponte* consider the merits when plaintiff asked it to reconsider its January 30, 2013 dismissal, the Appeals Council upheld the overpayment determination. (*Id.* at 4, 10.) It clarified:

> The Council has performed a *de novo* review of the entire record, including all submissions made directly to the Council. *We have not excluded any record materials associated with this case.* This [decision] address[es] the appellant's concerns that the decision-makers below did not have the benefit of considering certain materials, like Dr. M[uskin]'s affidavit, that the appellant believes supports a favorable outcome.

(*Id.* at 11 (emphasis added).)

After explaining that the "treating physician rule has never been extended to apply in

Medicare cases," the Appeals Council provided a detailed analysis of its assessment of Dr.

Muskin's testimony. (*Id.* at 12–16.) Declining to follow Dr. Muskin's recommendation, it

noted:

> Dr. M.'s affidavit was offered in response to NGS's redetermination. Dr. M. believes that Dr. P.'s progress notes complied with the Medicare documentation requirements and that the services were reasonably designed to reduce or control the patients' psychiatric symptoms in the long-term, in order to prevent hospitalization and maintain their functional levels. . . .

> Dr. M. suggests that the "reviewer" of Dr. P.'s files was under the misconception that the services at issue constituted "long-term, insight oriented psychotherapy that might require special billing justification." In that context, Dr. M. notes that the redetermination did not address "the supportive and cognitive-behavioral modalities actually employed." Further, Dr. M. maintains that "[d]ata analysis by itself cannot identify overutilization; it can only identify variations from the norm." . . .

> The Council has considered the medical documents stored on a CD, as well as the medical documents in the beneficiary files. . . .

> The Initial Psychiatric Evaluation forms are comprised mainly of form language, and check-the-box and fill-in-the-blank entries. To the extent the forms include handwritten entries, many entries are illegible. As the QIC noted, much of [the] contents of the Progress Notes appeared similar, with little variation from one beneficiary case to another. . . .

> The Council agrees with the QIC's assessment. We note numerous examples of deficiencies in the documentation, in terms of substantive content as relevant to determining whether the services were medically reasonable and necessary for each beneficiary. The most significant deficiency is that the supporting evidence is largely indistinguishable from that for one beneficiary to another; many documents include summary entries at best.
> . . .

> Moreover, some of the content in the documentation appears to be inconsistent and, at times, is contradictory. For instance, each beneficiary's Progress Note contains the following statements, the apparent inconsistency of which is not explained or appropriately addressed elsewhere in the documentation. *"[He/she] was fully cooperative with the exam and makes good eye contact. [He/she]*

*was not cooperative with the exam and eye contact was limited; eyes were downcast."* . . .

> [A] claim for Medicare reimbursement requires documentation of the beneficiary-specific history, needs, treatment goals, progress, and efficacy of treatment. The appellant's documentation does not meet this requirement. In our view, there is little appreciable variance in terms of substantive content among the documents. Other than an itemization of each beneficiary's medication, there is little or no clearly detailed or documented treatment information in the Progress Notes. . . . [W]hile the LCD allows coverage for patients who continue to show improvement in accordance with an individualized treatment plan, the LCD reasonably requires evidence of such plans and requires documentation of the achievement of the identified goals established in a plan. No such information is present in the records before the Council.

(*Id.* at 15–18 (emphasis added).)

Although the Appeals Council acknowledged that plaintiff advanced the argument that the QIC physician lacked the necessary qualifications under the Medicare Act to review plaintiff's billing records and make an accurate determination, it did not reach the question. (*Id.* at 13–24.)

### D.  Timeline of Events

The timeline of events precipitating the instant action can be summarized as follows:

**Year 2011**

| | |
|---|---|
| **June 23** | SafeGuard selects Dr. Pinkusovich's psychiatric practice, Art of Healing, for review due to a greater use of Medicare billing code CPT 90807 (individual psychotherapy with medical management services) relative to peers. |

**Year 2012**

| | |
|---|---|
| **Oct. 9** | Its review completed, SafeGuard sends a letter to plaintiff explaining that Medicare overpaid Art of Healing in the amount of $410,468.95 between January 3, 2008 and April 3, 2011. |
| **Oct. 23** | Plaintiff receives notice from NGS indicating that it owes Medicare $410,468.95. |

| **Nov. 21** | Plaintiff seeks redetermination by NGS, explaining that the documentation provided to Medicare substantiates the finding that no overpayment occurred. Art of Healing argues that: (1) good cause did not exist for SafeGuard to reopen the claims; (2) SafeGuard improperly failed to request documentation from Art of Healing and to properly notify it that its claims were being re-opened; and (3) NGS should provide plaintiff with documentation so that it can challenge the determination if necessary. |
|---|---|
| **Dec. 20** | In order to authenticate appeal, NGS requests further information from plaintiff, including identification numbers and patient information. |
| **Dec. 28** | NGS dismisses plaintiff's redetermination on procedural grounds, finding that the appeal did not contain the beneficiaries' name, valid health insurance claim numbers, the specific services to be reviewed, or the name and signature of the person being represented. Stating that written consent from an individual or a representative is necessary in order to release medical records, NGS also requests documentation of plaintiff's appointed representative. |

### Year 2013

| **Jan. 7** | After including an Appointment of Representative Form, plaintiff resubmits its November 21, 2012 appeal to NGS. |
|---|---|
| **Jan. 15** | Plaintiff seeks reconsideration by the QIC of NGS's December 28, 2012 procedural dismissal. |
| **Jan. 30** | QIC dismisses plaintiff's appeal of NGS's procedural dismissal. |
| **Feb. 5** | Having identified the beneficiaries whose claims had been denied, which rendered the January 30, 2014 QIC decision dismissal, plaintiff seeks to reinstate its appeal of NGS's procedural dismissal to the QIC. At this point plaintiff has two concurrent actions regarding the same claims pending: one before NGS and one before the QIC. |
| **Feb. 20** | This time, assessing the merits of the appeal, NGS upholds SafeGuard's determination that plaintiff was overpaid by Medicare. |
| **Feb. 25** | QIC vacates its January 30 dismissal. |
| **Apr. 12** | QIC issues an unfavorable reconsideration on the merits regarding plaintiff's January 15, 2013 appeal. The decision is signed by Dr. Frank DelliCarpini, an internist. On the same day, Dr. Muskin signs a sworn affidavit on behalf of Dr. Pinkusovich, finding that with regard to the claims in question: (1) Dr. Pinkusovich fulfilled the requirements of the CPT 90807 code; (2) the services provided by Dr. Pinkusovich to |

Medicare beneficiaries were medically necessary; and (3) the denial of the claims by Safeguard was based on the consultant's mistaken impression as to the type of psychiatric services Dr. Pinkusovich was providing.

**Apr. 16**  Plaintiff appeals NGS's February 20, 2013 redetermination to the QIC, submitting Dr. Muskin's testimony.

**Apr. 19**  Plaintiff receives letter from QIC informing it of its April 12, 2013 decision on the merits.

**Apr. 22**  Plaintiff writes a letter to the QIC asking for withdrawal of the April 12, 2013 decision, alleging that it was improperly made on substantive, rather than procedural, grounds.

**Apr. 26**  Dr. Pinkusovich writes a letter to QIC alleging that Dr. DelliCarpini was not qualified to conduct a review of his psychiatric records.

**May 21**  Dubbing the second appeal a "duplicate submission," QIC dismisses the appeal filed on April 16, 2013.

**May 23**  The QIC responds to plaintiff's April 22, 2013 letter, stating that unless a procedural error has occurred, further appeals must be addressed to the ALJ.

**June 10**  Plaintiff appeals the QIC's April 12, 2013 unfavorable reconsideration to ALJ.

**Nov. 18**  Having not received an ALJ decision, plaintiff escalates its appeal to the Appeals Council.

**Nov. 25**  Dr. Pinkusovich sends another personal letter to the Appeals Council accusing the QIC of wrongdoing.

### Year 2014

**Jan. 23**  The Appeals Council informs plaintiff by letter that the appeal will be decided on the papers without a hearing.

**Apr. 24**  After reviewing plaintiff's November 18, 2013 appeal and the entire record, including Dr. Muskin's affidavit, the Appeals Council upholds NGS's overpayment determination on the merits. The opinion does not address the allegation that Dr. DelliCarpini was not qualified to review Dr. Pinkusovich's billing records.

**June 26**  The instant action is filed in the United States District Court for the Eastern District of New York.

## III.  Law

### A.  Administrative and Judicial Review Under the Medicare Act

#### 1.  Relevant Statutory Authority

The Medicare Act provides the sole avenue for administrative and judicial review of

Medicare claims.  *Heckler*, 466 U.S. at 614 (affirming dismissal of plaintiff's complaint because

the designated levels of the administrative appeals process under the Medicare Act had not been

exhausted).  Section 1395ff(b)(1)(A) of the Medicare Act reads:

> [A]ny individual dissatisfied with any initial determination . . .
> shall be entitled to reconsideration of the determination, and . . . a
> hearing thereon by the Secretary [and] to judicial review of the
> Secretary's final decision after such hearing as is provided in
> section 405 (g) of this title.

42 U.S.C. §1395ff(b)(1)(A).

Congress explicitly provided that section 405(g) is the exclusive authority for seeking

review of a decision of the Secretary in section 405(h) of Title 42 of the United States Code,

made applicable to Medicare Part B claims by section 1395ii of the same title.  *Abbey v. Sullivan*,

978 F.2d 37, 43 (2d Cir. 1992), *cited with approval by Shalala v. Illinois Council on Long Term

Care, Inc.*, 529 U.S. 1, 18 (2000).  Section 405(g) reads as follows:

> Any individual, after any final decision of the Commissioner of
> Social Security made after a hearing to which he was a party,
> irrespective of the amount in controversy, may obtain a review of
> such decision by a civil action commenced within sixty days after
> the mailing to him of notice of such decision or within such further
> time as the Commissioner of Social Security may allow.

> Such action shall be brought in the district court of the United
> States for the judicial district in which the plaintiff resides, or has
> his principal place of business . . . .

> As part of the Commissioner's answer the Commissioner of Social
> Security shall file a certified copy of the transcript of the record
> including the evidence upon which the findings and decision
> complained of are based.

The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered . . . which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation . . . the court shall review only the question of conformity with such regulations and the validity of such regulations.

The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

Such additional or modified findings of fact and decision shall be reviewable only to the extent provided for review of the original findings of fact and decision.

The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions.

Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such

office.

42 U.S.C. § 405(g) (due to the length of the provision and individual sentences, each sentence has been formatted as a distinct paragraph to ensure readability).

## 2. Section 405(g) Sixth Sentence Remands

"Sentence-six remands may be ordered . . . where the Secretary requests a remand before answering the complaint." *Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993). A sixth sentence remand "permits the district court to remand without making any substantive ruling as to the correctness of the [Secretary's] decision." *Raitport v. Callahan*, 183 F.3d 101, 104 (2d Cir. 1999) (collecting cases); *see also McBride v. Smith*, 405 F.2d 1057, 1059 (2d Cir. 1968) ("'[T]he guiding principle is . . . that the function of the reviewing court ends when an error of law is laid bare. At that point, the matter once more goes to the Commission for reconsideration.'") (quoting *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952)). "Sentence six remand orders are considered interlocutory and non-appealable, because the district court retains jurisdiction over the action pending further development and consideration by the ALJ." *Butts v. Barnhart*, 388 F.3d 377, 384 n.4 (2d Cir. 2004) (internal quotation marks and citation omitted).

The Supreme Court explained its favoring of remands as follows:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, *the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation*. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added). *See also Nat'l Audobon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d. Cir. 1997) ("Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made

the decision.") (citing *Fla. Power & Light Co.*, 470 U.S. at 743–44); *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) ("[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with correct legal standards.") (internal quotation marks and citation omitted); *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 853 (9th Cir. 1997) ("Absent a final agency decision [from the Appeals Council], this court simply has no jurisdiction to 'review' [plaintiff's] claim that equitable tolling permits its appeal."); *Pereira v. Astrue*, 279 F.R.D. 201, 208–09 (E.D.N.Y. 2010) (remanding for further proceedings where Commissioner conceded that legal standard was applied improperly by ALJ).

The Secretary's admission of error constitutes "good cause" for a sentence six remand. *See Medina v. Apfel*, No. 00-CV-3940, 2001 WL 1488284, at *5–6 (S.D.N.Y. Nov. 21, 2001) (Commissioner's concession that ALJ applied wrong legal standard provides good cause for sixth sentence remand); *Torres v. Shalala*, 938 F. Supp. 211, 217–18 (S.D.N.Y. 1996) ("Here, the Secretary has moved to remand prior to filing an answer and has demonstrated good cause by acknowledging legal error.") (citations omitted) (collecting cases).

## B. The *Accardi* Doctrine

The *Accardi* doctrine stands for the notion that rules promulgated by federal agencies, which are used to regulate the rights and interests of others, "are controlling upon the agency." *Montilla v. I.N.S.*, 926 F.2d 162, 166 (2d Cir. 1991) (citations omitted). The doctrine dictates that when an agency fails to adhere to its own regulations, its determination will be reversed and deemed invalid if either (1) the regulation was promulgated to protect a fundamental right derived from the Constitution or a federal statute, or (2) the challenged proceeding violated the

27

agency regulation in a manner that prejudices the rights sought to be protected by the subject

regulation. *Ali v. Mukasey*, 524 F.3d 145, 149 (2d Cir. 2008) (dismissing petitioner's claims

because the challenged procedures fell within the purview of the judicial review process of the

presiding agency) (citing *Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993)).

> The Court of Appeals for the Second Circuit has recognized the
> continuing vitality of the *Accardi* doctrine, which it has described
> as a "judicially-evolved rule ensuring fairness in administrative
> proceedings" under which, in certain circumstances, "the rules
> promulgated by a federal agency, which regulate the rights and
> interests of others, are controlling on the agency." The doctrine is
> particularly applicable where . . . the agency regulation that was
> departed from governs "the rights or interests of the objecting
> party." The doctrine "is premised on fundamental notions of fair
> play underlying the concept of due process," and it provides an
> avenue for the exercise of judicial restraint by avoiding a decision
> of the case on Constitutional grounds.

*Hickey-McAllister v. British Airways*, 978 F. Supp. 133, 140 (E.D.N.Y. 1997) (citing *Montilla*,

926 F.2d at 166–68).

## C. The Administrative Procedure Act

Under the APA, a court is authorized to "set aside agency action, findings, and

conclusions found to be . . . without observance of procedure required by law." 5 U.S.C.

§ 706(2)(D). The statute reads as follows:

> To the extent necessary to decision and when presented, the
> reviewing court shall decide all relevant questions of law, interpret
> constitutional and statutory provisions, and determine the meaning
> or applicability of the terms of an agency action. The reviewing
> court shall--
>
> > (1) compel agency action unlawfully withheld or
> > unreasonably delayed; and
> >
> > (2) hold unlawful and set aside agency action, findings, and
> > conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

The Court of Appeals for the Second Circuit has held that "*where no provision of [section] 405(g) is on point*, [courts] apply the judicial review provisions of the APA." *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 78 (2d Cir. 2006) (emphasis added) (finding that because section 405(g) does not provide for judicial review of administratively adopted rules, the court of appeals analyzed the rule relied upon by the Department of Health and Human Services under the judicial review standards of the APA). *See also N. Y. Pub. Interest Research Grp., Inc. v. Johnson*, 427 F.3d 172, 179 (2d Cir. 2005) ("Because the [Clean Air] Act does not provide a standard of review, we review the EPA's actions under the [APA].").

## IV.  Application of Facts to Law

Unavailing is plaintiff's argument that the court should first determine whether plaintiff can prevail on the existing record before determining whether to grant the Secretary's remand motion. (Pl.'s Mem. of Law in Further Supp. of Mot for Summ. J. 4.)  The court has reviewed

the existing record in its entirety and come to the same conclusion as plaintiff—*i.e.*, that its summary judgment motion and its claims under the *Accardi* doctrine and the APA are "*inextricably intertwined* with the motion to remand." (*Id.* at 2 (emphasis added).) This finding, in conjunction with the Secretary's admission that the Appeals Council erred by failing to address plaintiff's argument that the QIC panel physician was not sufficiently qualified to conduct a review of the overpayment determination, mandates a remand.

Pursuant to the sixth sentence of section 405(g) of Title 42 of the United States Code, the case is remanded to the Appeals Council to arrange for a full hearing on the merits—both substantive and procedural. The administrative hearing shall: (1) address the propriety of Dr. DelliCarpini's review of Dr. Pinkusovich's billing records and whether, if necessary, another review of the records needs to be conducted by a qualified physician; (2) determine whether the QIC appropriately issued a decision on the merits as opposed to one on procedural grounds; (3) resolve the issue of whether remand to the QIC is appropriate; and (4) consider such other matters as are relevant to a decision on the merits of plaintiff's claims.

The Medicare Act provides that, after hearing on remand and issuance of the decision on remand, the Secretary:

> shall file with the court any such additional and modified findings
> of fact and decision and, in any case in which the [Secretary] has
> not made a decision fully favorable to the individual, a transcript of
> the additional record and testimony upon which the [Secretary's]
> action in modifying or affirming was based.

42 U.S.C. § 405(g) (sixth sentence). The statute authorizes the court to review the Secretary's additional or modified findings of fact and decision to the same extent as the original decision. 42 U.S.C. § 405(g) (seventh sentence).

30

## V. Conclusion

Defendant's motion to remand this action for further consideration by the Medicare Appeals Council is granted.

The parties shall provide the court with an order regarding the substantive and procedural issues to be addressed at the full hearing to be conducted at an appropriate administrative level. *See* Hr'g Tr. Mar. 9, 2015.

The motion for summary judgment is denied as moot.

This court retains jurisdiction. The case shall be marked "closed," subject to being reopened by letter.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated:  March 10, 2015
        Brooklyn, New York